# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01759-COA

JALEN SHAQUILLE WILLIAMS A/K/A JALEN SHAQUILLE WILLIAMS SR. A/K/A JALEN WILLIAMS          APPELLANT

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 04/12/2017 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KAYLYN HAVRILLA McCLINTON |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/02/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., TINDELL AND McDONALD, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Jalen Williams was convicted of capital murder on March 21, 2017. He appeals the jury's verdict and the trial court's denial of his post-trial motions. Finding no error, this Court affirms the trial court's orders.

FACTS

¶2. In the early evening of July 22, 2014, Jalen Williams, age 19, and Rashad Johnson, age 20, were shooting dice in the parking lot of a church in Gulfport, Mississippi. As they

left, they commented to others, including Justin Atkinson, that they were going to "hit a lick," meaning they were going to rob someone. That someone was Lamont Hayes who had attended the dice game a couple of weeks earlier flashing one-hundred dollar bills. According to Atkinson, Williams called him the next day to tell him about the robbery "gone wrong." Apparently, Williams and Johnson had entered the home with guns. Williams and Hayes began tussling, and Williams called for Johnson's help. Johnson came upon the two and fired two shots at Hayes. They both fled, and Hayes later died from his wounds.

¶3.    Rashad Johnson pleaded guilty to murder and testified at Williams's trial. He said that the robbery was Williams's idea and that Williams gave him one of the two guns Williams had. They covered their faces with bandanas as they entered the home. Williams went to Hayes's bedroom while Johnson checked out the others. When Johnson entered Hayes's bedroom, Williams had his gun to Hayes's head. Hayes was asleep but woke up when Johnson came in. Hayes grabbed Williams's arm, and Johnson started hitting Hayes in the head to get him loose. But Hayes held on. Williams and Hayes got into the hallway and were still struggling with each other when Johnson got hold of the gun they were fighting over. Williams called to Johnson to get Hayes off him, which Johnson took as a directive to shoot Hayes, which he did—twice in the leg. They both ran outside; Johnson gave Williams his gun back, and they went their separate ways. Johnson was later arrested on drug and firearm charges and ultimately gave a statement concerning the Hayes robbery and shooting.

¶4.    At trial, other witnesses testified including Hayes's wife, Jennifer; his son, Xavier; various law enforcement personnel; and the chief medical examiner. Williams did not

2

testify, but the State introduced his 164-page interrogation transcript into evidence. In that statement, after initially denying any involvement in the incident, Williams confessed that he and Johnson had gone to the Hayes home, both armed, intending to scare Mr. Hayes into giving up his money. But things went awry. He said that Johnson went in the house first and down the hallway to Hayes's bedroom. Williams followed. Hayes woke up, and Johnson and Williams demanded his money. Hayes started to get out of bed, and Williams, who had an unloaded gun, threatened Hayes not to move. Hayes grabbed Williams's arm and started fighting him. The fight moved into the hallway and then to the living room. Hayes was trying to get the gun from Williams. Finally, it came loose, and Williams slid it away from them and yelled for Johnson to get Hayes off of him. Williams said he did not know where Johnson was, but he (Williams) finally got Hayes off, picked up the gun, and ran out the front door. As he was running down the street, he heard gunshots.

¶5.     Other evidence included texts from Williams's cell phone. In response to a text from a friend called Ced who asked what Williams and "Little Snow" (Johnson) had done, Williams responded: "Home invasion gone wrong." Referring to another person who had gone with them named Cook, Williams went on to say "[I]dk if yu kno cook but he took off running on us and he supposed to be a gangsta." Ced replied "[I]dk him cuz. Y'all straight though." Williams replied, "[Y]eah da n---- dead though."

¶6.     At the end of the trial, the jury found Williams guilty of capital murder. The trial court denied Williams's post-trial motions and sentenced Williams to life without parole.

¶7.     On appeal, Williams raises only two issues that he claims merit reversal of his

3

conviction: (1) whether the trial court erred in preventing Williams from cross-examining Justin Atkinson about what sentence Atkinson could have received on another charge had he not cooperated with the district attorney and testified in this case; and (2) whether the trial court erred in not allowing Williams to call character witnesses.

STANDARD OF REVIEW

¶8. Limitations placed on cross-examination are reviewed using an abuse-of-discretion standard. *Johnson v. State*, 242 So. 3d 145, 153 (¶15) (Miss. Ct. App. 2017). "The trial court's decision will stand unless the reviewing court concludes that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Id.* Reversal is proper only when the discretion of the trial court as to relevancy and admissibility of evidence has been abused and a substantial right of a defendant has been affected. *Timmons v. State*, 44 So. 3d 1021, 1024 (¶10) (Miss. Ct. App. 2010). The Court reviews de novo a Confrontation Clause objection. *Smith v. State*, 986 So. 2d 290, 296 (¶18) (Miss. 2008).

DISCUSSION

I. Did the trial court err in limiting Williams's cross-examination of Justin Atkinson?

¶9. The State called Justin Atkinson to testify as to actions of Williams and his alleged accomplice, Rashad "Snow" Johnson, prior to the actual robbery. This included statements they made about what they were planning to do ("hit a lick"), what they were wearing, and that weapons Williams had. Atkinson also testified about Williams's coming to his house the next day and telling him what had happened.

¶10. At trial, Atkinson testified that he was currently serving a twelve-year sentence for

4

possession of marijuana with intent. He recently had pleaded guilty to other charges: possession of a firearm by a felon and transfer of a controlled substance. He had not been sentenced on those charges, but the State had recommended a three-year sentence, consecutive to his twelve years. He was asked:

> Q. Do you know what your potential sentence is total between the two?
>
> A. Fifteen years.

The State had clearly brought out that it had recommended a lesser sentence for the charges Atkinson was still facing, with a reduction from fifteen to three years.

¶11. On cross-examination, Williams's attorney spent considerable time questioning Atkinson about his latest arrest and how Atkinson had spoken to the police about the facts of this case with the hope that such cooperation would positively affect the charges he was facing:

> Q. Okay. All right. So it's true. You wanted to try and tell them what they wanted to hear that would help you get out of your trouble, right?
>
> . . . .
>
> Q. You were trying to tell the officers things that you thought would help you get them to help you get out of your trouble, right?
>
> A. Yes.

At this point, Williams's attorney went further, trying to establish through Atkinson that because he was a repeat offender, under the Uniform Controlled Substances Act, he was subject to twice the sentence for the pending possession with intent to transfer charge that he would normally get. Miss. Code Ann. § 41-29-147(Rev. 2013). Williams's attorney

5

asked:

> Q. Okay. Now, let's start with you haven't been sentenced on your felonies yet, have you?
>
> A. No, sir.
>
> Q. And you said today -- what did you say you pled guilty to?
>
> A. Possession of a firearm and transfer.
>
> Q. Possession of a firearm and transfer?
>
> A. Transfer.
>
> Q. And that transfer was selling marijuana?
>
> A. Yes.
>
> Q. Okay. Now, on top of that, in addition to the sentence that you're looking at for that, you also have prior convictions, right?
>
> A. Yes.
>
> Q. What are your prior convictions?
>
> A. Possession of intent.
>
> Q. Possession with intent, right, which do you understand they could double the maximum sentence?

At this point, the State objected, and the parties met at the bench.

> THE COURT: You can talk about any deal that they made, but you're not going to go ahead and give a law lesson on what his exposure is.
>
> THE DEFENSE: I would like I believe that he's entitled to see what he has done. He's working deals, and I want to show what his exposure was and whether he was able to work a deal.

6

THE COURT: Well, he was facing -You can ask him about a deal, not about what his legal exposure is. I've ruled.

Williams's attorney still tried to get out the enhancement and asked:

THE DEFENSE: As part of your deal when you pled guilty, was it agreed that your case would not be enhanced?

THE STATE: Objection, Your Honor. He's trying to get the back door the same argument.

THE COURT: Sustained. Go ahead and ask him, what was the deal?

THE DEFENSE: I would ask for an opportunity to make a record at a later time on an issue.

THE COURT: You will.

Williams's attorney went no further with this questioning.

¶12. After the jury was retired, Williams's attorney made his proffer by questioning Atkinson further:

THE DEFENSE: Now, while he's here, I would ask to proffer on the sentence issue.

Q. With respect to a bargain, okay, you were facing -- pled guilty to two charges, right?

A. Yes.

Q. As part of your deal, what charges were dismissed and not prosecuted?

A. There was no deal.

Q. Were you not arrested for other things that were not prosecuted? Did you not have other pending charges where you got arrested for other things and when you plead guilty to these two things, that the other ones were just passed to the files?

7

A.    I don't remember.

Q.    Do you remember whenever you were working out this deal, do you remember whether or not your potential maximum sentence could be doubled because you had a prior drug case and this is another drug case?

A.    No.

Q.    You're saying no, it cannot be doubled or enhanced?

A.    Could you re-ask the question?

Q.    Right. When you met with your attorney to work out your attorney presumably made the deal with the prosecutor, right? You didn't talk to the prosecutor about the plea bargain, did you?

A.    No.

Q.    Okay. So when your attorney instructed you on what you could be facing if you were convicted, did your attorney tell you that the state had the ability to enhance your conviction, your drug case, to double it?

A.    No, sir.

Q.    And whether your attorney told you that or not, are you familiar enough that you know that by, having a prior drug case and getting another drug case, that the state could double your potential maximum sentence?

A.    No, sir. I didn't know that.

¶13.   On appeal Williams now claims that this line of cross-examination on the potential enhancement of Atkinson's sentence was improperly denied and that this denial prevented him from presenting his defense, i.e., that Atkinson was not telling the truth and that Williams's involvement in the shooting was ancillary.

¶14.   An accused has the right to confront and cross-examine the witnesses against him.

8

*Ambrose v. State*, 254 So. 3d 77, 101 (¶56) (Miss. 2018). A leniency/immunity agreement may be presented to the jury which would tend to impeach or show bias of a witness. *Barnes v. State*, 460 So. 2d 126, 131 (Miss. 1984). But a defendant's right to cross-examination is not unlimited, and the Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *Harris v. State*, 242 So. 3d 181, 185 (¶10) (Miss. Ct. App. 2018).

¶15. While this Court recognizes this important constitutional right, in Williams's case the cross-examination would have added nothing beneficial to the defense. In the proffer, Atkinson denied knowing that he could have received twice the amount of time to serve. Atkinson had already testified that he had charges pending to which the State had recommended a reduced sentence from twelve years to three years. On cross-examination Atkinson revealed that he specifically asked the police whether he could get help with his current charges if he told them what he knew in this case. Thus, the jury had evidence that Atkinson was getting leniency from the State on his current charges in exchange for his testimony, which Williams's attorney thoroughly probed for his client's benefit. The trial court did not limit Atkinson's cross concerning this; it only limited questioning concerning statutory provisions of enhancement, about which Atkinson knew nothing. This Court does not find any error in the trial court's limitation under these circumstances.

¶16. Moreover, in order to establish an abuse of discretion, Williams must show clear prejudice resulting from the trial court's limitation of Atkinson's cross. *See Cage v. State*,

149 So. 3d 1038, 1044 (¶13) (Miss. 2014). This Court is not convinced that Williams was prejudiced in the presentation of his case by the trial court's ruling. The fact that Atkinson would be receiving a reduced sentence in exchange for his testimony was clearly before the jury for the defense to argue Atkinson's motivation to lie. The excluded testimony would have only shown that Atkinson was unaware of how good a deal he received and would add nothing to the defense. We find no prejudice to the defense in the trial court's limitation of Atkinson's cross-examination.[1]

> II. Did the trial court err by not allowing Williams to call character witnesses?

¶17. After denying the defense's motion for a directed verdict, the trial court addressed the parties outside the presence of the jury and asked Williams whether he had made a decision on whether or not he would testify. Williams said he had had an opportunity to talk to his attorney and he had decided not to testify. Thereafter there was the following exchange between defense counsel and the trial court:

> THE COURT: Okay. Y'all take a seat. All right. We'll take a short recess. Get your witness here. We'll get started.

---

[1] Even if the exclusion of this testimony amounted to a violation of Williams's constitutional confrontation right, this violation was harmless error. In *Smith v. State*, 986 So. 2d 290, 302 (¶37) (Miss. 2008), an admission by a co-defendant of his implication in a crime was excluded. After concluding that this may have been a constitutional violation, our Supreme Court found that the violation was harmless because this information had already been presented from the defendant himself without contradiction. *Id*. at 301 (¶36). Similarly, here Atkinson admitted that he had asked law enforcement if talking about the incident would help him on his other charges. The jury was also told that the State recommended a lower sentence on Atkinson's pending charges, obviously in exchange for his cooperation. Most importantly, the proffer showed that Atkinson would not have been able to testify to the years of enhancement anyway.

THE DEFENSE: I need to address that issue. Without the defendant testifying, my witnesses, the only witness I'm going to bring in would be character witnesses. And by the defendant not testifying, I think that the state may try to object to me putting in character testimony. But the character, I would submit that even though the defendant didn't testify, it would nonetheless be admissible.

THE COURT: His character's not at issue if he doesn't testify. That's the law.

THE DEFENSE: That's what I anticipated that they would say, but I would submit that the defendant did testify by way of his statement.

THE COURT: Well --

MR. CROSBY: So if that's your ruling, I wanted to make sure that was–

THE COURT: That is the law, and we're going to follow it as best we can.

MR. CROSBY: Then in that event, we're not going to produce any evidence.

THE COURT: So you're going to rest?

MR. CROSBY: Yes, sir.

On appeal, Williams argues that the trial court erred in precluding the testimony of his character witness(es).

¶18. Mississippi Rule of Evidence 404 deals with character evidence, crimes or other acts. It states:

    (a)    Character Evidence.

        (1)    *Prohibited Uses*. Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.

(2)     *Exceptions for a Defendant or Victim in a Criminal Case*. The following exceptions apply in a criminal case:

(A)     a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it;

(B)     a defendant may offer evidence of an alleged victim's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it; and

(C)     the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor.

Williams contends that the trial court erred when it prohibited him from calling a character witness. However, Williams made no proffer of who that character witness was or what that witness would have said. When a trial court prevents the introduction of certain evidence, it is incumbent on the offering party to make a proffer of the potential testimony of the witness, or the point is waived for appellate review. *Redhead v. Entergy Miss. Inc.*, 828 So. 2d 801, 808 (¶20) (Miss. Ct. App. 2002). We said in *Redhead*:

> To preserve the excluded testimony for appeal, a proffer would have to have been made so this Court would know what testimony was excluded. Since this matter was not properly preserved for appeal, then this issue will be treated as waived.

*Id.* This applies in criminal cases as well. *See Turner v. State*, 732 So. 2d 937, 951 (¶55) (Miss. 1999) ("When a trial court rules so as to prevent certain testimony from being introduced, it is incumbent on the party to make a proffer of what the witness would have testified to or the point is waived for appellate review."). We have underscored the need for a proffer in several recent cases, saying:

12

> Generally, when a party seeks to offer evidence which in turn is excluded by the trial court, before we will consider the matter on appeal the party must have somehow placed in the record the nature and substance of the proffered evidence for our consideration. When testimony is excluded at trial, a record must be made of the proffered testimony in order to preserve the point for appeal.

*Harrell v. State*, 179 So. 3d 16, 21 (¶15) (Miss. Ct. App. 2014). Without the proffer of what this character witness would have said, it is impossible for this Court to find error in the trial court's ruling.

¶19. We agree with the concurrence that under Rule 404, a criminal defendant is not required to testify prior to offering "character evidence." However, it should be noted the "character evidence" that could be allowed would only be evidence "to prove that on a particular occasion the person acted in accordance with the character or trait." As illustrated in the comment to Rule 404, if a defendant claims that the victim was the initial aggressor and the defendant's actions were in the nature of self-defense, he may put in evidence of the victim's violent character—but only after the defendant had offered evidence of an overt act perpetrated against him by the victim. Rule 404 does not give criminal defendants carte blanche to offer evidence of "truthfulness" or "peacefulness." Rather, the character evidence must be presented to show that on a particular occasion, the defendant or victim acted in accordance with a particular trait he has. Again, without a proffer of the nature of the character evidence, we cannot conclude that the trial court erred in excluding it.

CONCLUSION

¶20. Finding no abuse of discretion, arbitrariness, or other error by the trial court, we hereby affirm.

13

¶21.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, LAWRENCE AND C. WILSON, JJ., CONCUR. McCARTY, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, TINDELL AND LAWRENCE, JJ.**

**McCARTY, J., SPECIALLY CONCURRING:**

¶22.    While I agree that without a proffer we cannot know what character evidence the defendant wished to place into evidence, and therefore cannot reverse, I write separately to emphasize that the Rules of Evidence do not require a defendant to testify before introducing Rule 404(a) evidence. There is nothing in the plain language of the Rule that requires this, and if there were, it would place the Rules in an insurmountable tension with our Constitution. The trial court's ruling that Williams could not introduce evidence of character, coupled with the denial of a more extensive cross-examination, compels me to write separately.

¶23.    Our Constitution mandates that a defendant "shall not be compelled to give evidence against himself . . . ." Miss. Const. art. 3, § 26. Therefore a defendant does not have to testify during a trial, as the defendant in this case did not. Even if a person did testify, the person's statements and other evidence are still subject to admission by the trial court. *See* M.R.E. 104 (preliminary questions of admissibility are for the trial court).

¶24.    In general, "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." M.R.E. 404(a)(1). This is for the most part a complete bar to the admission of this type of evidence in a civil case. *See Alpha Gulf Coast Inc. v. Jackson*, 801 So. 2d 709, 730 (¶77)

14

(Miss. 2001) ("This Court has held that in civil cases, generally, a party may not support its position with testimony concerning good character or reputation."). Yet even in civil cases, "[w]hen good character and reputation are in issue . . . such as in a false imprisonment case, the evidence is admissible." *Id*.

¶25. There is a specific and express exception for defendants in criminal cases to the ban on character evidence. "[A] defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." M.R.E. 404(a)(2)(A). The express exception still has permissive language, indicating that the evidence is still subject to admission under the trial court's wide discretion.

¶26. Indeed, the plain language of Rule 404 even sets out how the procedure will work. If a defendant brings in evidence, then the prosecutor has the ability to rebut it if she so chooses. This is a simple procedure that recognizes the extraordinarily high stakes of a criminal trial – not the loss of money or property through a damages award, but the loss of liberty through a guilty verdict.

¶27. The Supreme Court explained this procedure in 1993, noting that "[t]his Rule flatly prohibits the use of character evidence of a defendant to show he acted in conformity therewith on a particular occasion, *unless* (1) such evidence is offered by the defendant or (2) the defendant takes the witness stand." *Hopkins v. State*, 639 So. 2d 1247, 1251 (Miss. 1993). As Rule 404(a) and the *Hopkins* Court make clear, there is no requirement that the defendant him or herself testify before they may offer character evidence. Offering character evidence through a witness is sufficient.

15

¶28. There is nothing that requires that the defendant waive his or her right to not give testimony under our Constitution. Even if that were the law, which it is not, any concern of lack of testimony would have been greatly alleviated by the admission of the 164-page interrogation of the defendant, which provided a de facto testimony for the jury to assess.

¶29. The refusal to allow the defendant to produce witnesses was coupled with a restraint on cross-examination. "The right to cross-examine a witness has been held to be a valuable and highly protected right." *Holliday v. State*, 758 So. 2d 1078, 1082 (¶12) (Miss. Ct. App. 2000). "The right of cross-examination has been limited only to clear cases of irrelevancy, trespass beyond admissible grounds, or extremes of continual aimless repetition." *Id*.

¶30. In the trial giving rise to this appeal, defense counsel sought to deeply cross-examine a witness who had blatantly admitted that he was trying to curry favor with law enforcement in exchange for leniency. When asked, "You were trying to tell the officers things that you thought would help you get them to help you get out of your trouble, right?" the witness replied, "Yes." Cross-examination is made for just such a person. While it may not have been reversible error under the facts of this particular case, I believe that cross-examination should rarely be restrained.

**WESTBROOKS, TINDELL AND LAWRENCE, JJ., JOIN THIS OPINION.**

16